## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| CRISTINA TITSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 12-CV-2206 |
| | ) | |
| COMMUNITY ALTERNATIVES | ) | |
| ILLINOIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

### OPINION

---

Plaintiff, Cristina Titsworth, filed suit against Defendant, Community Alternatives Illinois, Inc., alleging she was terminated from her position by Defendant for engaging in a protected activity, namely expressing objections over the termination of another employee, in violation of the Age Discrimination In Employment Act of 1967 (ADEA) (29 U.S.C. § 623(d)). Defendant filed its Motion for Summary Judgment (#43) on January 30, 2014. Plaintiff filed her Response (#45) on February 24, 2014. Defendant's Reply (#48) was filed March 4, 2014. For the following reasons, Defendant's Motion for Summary Judgment (#43) is GRANTED in full.

### BACKGROUND

Defendant provides services to handicapped individuals residing in group homes located in Danville, Illinois. Defendant receives reimbursement for its services from governmental entities. Plaintiff, aged 29, was employed as a Director of Nursing for

Defendant beginning March 19, 2009. Cassidy Spesard was Defendant's Director of Operations and supervised Plaintiff during the August 2010 time period. During this time, Plaintiff supervised two licensed practical nurses (LPNs): Katie Guthrie and Jean Smith. Smith was a part-time nurse, while Guthrie was a full-time nurse. Smith was over the age of 40 in August 2010. Plaintiff was a registered nurse (RN) and paid a salary of $50,000, which was more than Guthrie and Smith were paid.

Plaintiff completed performance evaluations for both Guthrie and Smith and evaluated Guthrie higher than Smith. In her performance evaluation of Guthrie, Plaintiff stated that Guthrie was at Defendant more than any other nurse, that Guthrie's documentation was always timely and accurate, that she was very dependable, and that Defendant was lucky to have such a great nurse. When Plaintiff was Director of Nursing, no one else was the direct supervisor of nurses. Plaintiff had no knowledge that anyone besides her reviewed the work of the LPNs she supervised. In a March 11, 2010 letter to her supervisors, Plaintiff stated that "starting in August of '09, I was slowly starting to cut nursing hours due to more DSPs getting med trained. To date, I have been able to cut a total of 62 hours of paid nursing time per week." Plaintiff agreed that her making a determination as to how to cut nursing hours was an appropriate responsibility for her as the Director of Nursing. Plaintiff stated in her March 11, 2010 letter that she understood Illinois had not given any rate increases for quite some time and that that put Defendant in a fragile financial situation.

In her March 11, 2010 letter, Plaintiff requested to be able to work from home one

day a week. Her job duties did not require her to be physically present on site five days a week. She was on call seven days a week for 24 hours a day. She agreed that Defendant could have contracted a registered nurse (RN) to be on call 24/7. In her deposition, Plaintiff could not identify how much time she spent performing any one of her assigned areas of responsibility. Plaintiff's services as a Director of Nursing were not reimbursed by any governmental entity. The services provided by the two LPNs were reimbursed by a governmental entity.

On August 18, 2010, Smith was in the office at 2:00 p.m., which was after her work day usually ended. When Spesard allegedly asked Plaintiff why Smith needed that many hours, Plaintiff responded "Smith has arthritis in her knees, and her left wrist is dislocated." Plaintiff had observed that Smith wore a black sling because of her wrist condition. Plaintiff told Spesard that she relied on Guthrie more so than Smith.

In the 2010 time period, government reimbursements to Defendant were delayed. Sometime just prior to August 26, 2010, Spesard met with Dave Folkner, Defendant's Regional Director. Spesard and Folkner discussed that Defendant was using more nursing hours than were being reimbursed by government agencies. They discussed that it was necessary to reduce costs in operating expenses and overhead. On August 20, 2010, Plaintiff claims she was told that Defendant's regional director was coming in the next week and that he wanted to make nursing cuts. Spesard asked Plaintiff for ideas about cutting hours and Plaintiff agreed she would be the one to know where nursing cuts could be made. Plaintiff did not provide Spesard any ideas; but instead gave her

"push back."

When Folkner and Spesard had discussions about nursing changes just prior to August 26, 2010, Spesard had assumed Defendant was required to employ a full-time registered nurse under Rule 116, which is a regulation dealing with administration of medications. Spesard therefore did not originally consider eliminating the Director of Nursing full-time position when she talked to Folkner prior to August 26, 2010. Spesard and Folkner originally determined that Defendant would eliminate one of the LPN positions. Plaintiff was aware there were financial circumstances that were impacting Defendant.

On Thursday, August 26, 2010, Spesard, Jonna Lowe, and Plaintiff met in Spesard's office at or around 1:00 p.m. Spesard told Plaintiff that nursing hours had to be cut and one of the nurses would have to be terminated. Plaintiff was told they were cutting 30 nursing hours. Spesard asked Plaintiff for her opinion as to which LPN should be let go. Plaintiff claims she did not give her opinion as to which nurse should be cut, but instead told Spesard that both nurses were "awesome." Plaintiff admits she was in the best position to know which nurse she wanted to keep.

A second meeting was held on August 26 at 2:30 p.m., at which Guthrie, Smith, Spesard, Lowe and Plaintiff were present. Guthrie and Smith were told that a position needed to be eliminated. Both Guthrie and Smith indicated they were interested in the remaining position. When Spesard told Guthrie and Smith that she and Plaintiff would decide who gets the position, Plaintiff stated, in front of Guthrie and Smith, that she

would not choose. Plaintiff was irritated and stated that she wanted to keep both positions. She informed Guthrie and Smith, at the meeting, that Spesard was the one eliminating the position and that Spesard was therefore going to have to make the choice of which LPN to eliminate. Plaintiff admits she was not being supportive of Spesard when she made the statements in this meeting in front of Smith and Guthrie.

Spesard and Lowe left the conference room and Spesard reviewed the performance evaluations of Smith and Guthrie that Plaintiff had completed. Spesard noted that Plaintiff had rated Guthrie higher on the performance evaluation and Spesard therefore decided that Smith's part-time position would be eliminated. Spesard and Lowe returned to the conference room and Spesard indicated that Guthrie was selected for the position. Spesard and Lowe left the conference room after Spesard stated she picked Guthrie. Plaintiff did not say anything in the August 26 meeting after Smith was told her position was eliminated.

Plaintiff claims that, on August 26 while she and Spesard were discussing the potential nursing termination, Spesard specifically indicated that Smith was "getting older" and used that as an explanation for why Smith should be terminated. Plaintiff further claims that, during a conversation on August 18, 2010, she was questioned by Spesard about Smith's hours and Spesard commented that Smith's later competition for her job was "much younger."

Following this August 26, 2010 meeting, Plaintiff alleges she met with Smith in her office, which has a door. Plaintiff alleges she gave Smith the number for attorney

Sean Britton (Plaintiff's attorney) and said he dealt with wrongful terminations. No one else was present when Plaintiff talked to Smith in her office. Plaintiff claimed, in her notes from the time, that someone at Defendant must have "caught wind" of this conversation and that it led to her being forced to accept either a significant reduction in hours or termination. At her deposition, Plaintiff testified as to the following:

"Q.     And you state in your notes that somebody caught wind of what you told Smith. Correct?

A.     Yes.

Q.     And your notes don't tell who caught wind. Correct?

A.     Right.

Q.     And as we sit here today, you have no evidence that anyone at ResCare [Defendant] overheard your conversation with Ms. Smith at the time that it occurred?

A.     I have no evidence, no.

Q.     Okay. And what evidence do you have that anyone at ResCare learned that you told Smith to contact a lawyer about age discrimination between the time you had the conversation and the next day when you were offered a part-time position?

A.     We're in a really small office. I mean you can hear what's going on, but I don't have any specific evidence.

Q.     You know of no one at ResCare–

A.     Not to my knowledge. I don't have evidence to give you."

On Friday, August 27, 2010, Plaintiff was in and out of the office between 9:45 a.m. and 1:45 p.m. That morning Spesard called Dave Folkner to discuss what had occurred in the August 26 meeting with Plaintiff, Smith, and Guthrie. Folkner noted that the elimination of Smith's part-time LPN position did not result in much savings. Folkner and Spesard then discussed the Director of Nursing position, as the Director of Nursing hours were not being reimbursed and that position was paid a salary that was considerably more than the hourly wage paid to the LPN. Folkner questioned Spesard's assumption that Defendant was required to employ a full-time registered nurse. After reviewing Rule 116, and after contacting the Department of Human Services to confirm, Spesard and Folkner determined Spesard's original assumption was wrong and that Defendant was not required to employ a registered nurse on a full-time basis. Spesard and Folkner determined that since a full-time Director of Nursing position was not required under state law, Defendant could save more money by eliminating the full-time Director of Nursing position, creating a part-time nursing trainer position, and retaining the part-time LPN position.

Plaintiff met with Spesard at 2:00 p.m. on August 27, 2010. Spesard told Plaintiff during this meeting that her full-time position was being eliminated; that she could work part-time in a nurse trainer position; and that Smith's job was not going to be eliminated. During her deposition, the following exchange occurred between Plaintiff and Defendant's lawyer regarding the August 27 2:00 p.m. meeting:

"Q.   Okay. Now, when you were called back into the office by Joanna Lowe, where did you meet?

A.   In Cassidy's [Spesard] office.

Q.   And what time did you meet?

A.   2:00 p.m.

Q.   Okay. And you were informed at that time that Jean Smith's job was not going to be eliminated?

A.   Correct.

Q.   Okay. Did you understand at that point in time that you would no longer have a job if you didn't accept the part-time position?

A.   At that point, no.

Q.   What did you understand to mean when Cassidy said if you don't accept the eight hours, then today will be your last day with us?

A.   Well, they were basically saying that your hours are cut. You can only – I was thinking in the back of my mind I can't do this job in eight hours.

Q.   I understand that, but what did you understand Cassidy to be saying if you don't accept the eight hours, then your last day is today?

A.   I see what you're saying. Okay.

Q.   Did you understand if you didn't accept the reduced hours, that would be your last day?

A.   I did, but that wasn't what I wanted.

Q.  I understand there's a difference between what the situation was and what you wanted, but you understood if you didn't accept the part-time job, that would be your last day?

A.  Right. Right.

Q.  Okay. Besides you saying you can't do your job in eight hours, what else was said?

A.  I was worried about the consumers. That's my job as an RN trainer, as a DON is being an advocate not only for my nurses but the consumers, and I was genuinely concerned about that. I'm like how is that even possible, and so that raised red flags.

Q.  Okay. But you didn't during that meeting say, okay, I'll accept the eight hours?

A.  Never.

Q.  Okay. Then did you understand that if you weren't going to accept the eight hours you would no longer have a position?

A.  Right.

Q.  Okay. Did you tell Cassidy at that meeting what you would be doing?

A.  I don't remember.

Q.  Okay. Did this conversation that occurred on August 27th of 2010 at 2:00 p.m., that occurred before you contacted the hotline. Correct?

A.  I don't remember. Let me look at my notes. Yes. Yes.

Q.    Okay. And you knew that Jean Smith had her job back before you called the hotline?

A.    Right.

Q.    And was the call that you made to the hotline subsequently the first time you had ever called the hotline?

A.    Right.

Q.    Yes?

A.    I believe so.

***

Q.    Did you ask [Spesard] any questions at all?

A.    Yes.

Q.    Okay. Did you assume that you would be expected to still perform all of your old job duties?

A.    Of course.

Q.    That assumption is not necessarily correct. Right?

A.    The assumption and I explained to her that I could not – I explained to her that you can't do this job in eight hours.

Q.    Okay. Okay. You understood that if you were not accepting the new part-time position, Friday was your last day?

A.    Yes.

Q.    Okay. Did you tell Cassidy that you weren't accepting the position that

day?

A.     No. I did not.

***

Q.     But you understood that the position that they were taking was that your

       position was going to be cut, and if you didn't want to take the cut

       position, then Friday would be your last day. Correct?

A.     Well, whenever was my last day. I mean...

Q.     I'm not...

A.     I don't remember.

***

Q.     My question is simply this: You were told on Friday [August 27] that the

       company made a decision that you don't accept the eight hours a day, then

       that day is your last day. Right?

A.     Right.

Q.     So you understood at that point in time that they were telling you

       part-time job or nothing?

A.     Right."

Plaintiff was at home at 6:00 p.m. on the evening of August 27 when she made the

call to the hotline. This occurred after Spesard had informed Plaintiff that her full-time

position was eliminated, and that Plaintiff could take a part-time position. It was in this

call that Plaintiff claims she informed Defendant "of the age-biased discrimination."

Plaintiff returned to Defendant on August 30, 2010. Plaintiff came in to work on August 30 because she "had nothing in writing that stated that [she] no longer had [her] position" and that her hours were cut. The following exchange occurred during the deposition concerning Plaintiff's return to work on August 30, 2010:

"Q.     Okay. But you understood that it was their position the prior Friday that if you weren't going to accept the part-time job, you were gone?

A.     Right.

Q.     Okay. Did you come back to accept the offer of part-time employment?

A.     I did not.

Q.     Did you come back to tell Cassidy that you were not accepting the offer for part-time employment?

A.     I came back to explain how I can't do my job in eight hours and trying to — let's work on something. Let's compromise. Let's try to make this work, and she said no.

Q.     Well, that was the same thing you had said the prior Friday, that you couldn't do your job. Correct?

A.     Yeah, and at this point I had documentation to show all of the things that I was responsible for, so I had some concrete evidence to say, hey, look. I just got back from Rule 116 class. Look at all of this stuff that I'm responsible for. This is why I can't do it in eight hours.

Q.     Okay. And that didn't change their mind. Right?

A.      Nope. Well, they said, well, how about 12 hours? How about 15 hours?

Q.      And you didn't want that either?

A.      I'm like that really bothered me. I was really upset about that, because now a decision that was once, oh, this is – it's eight hours. Oh, now we can negotiate to 12 or 15 hours? That was really upsetting to me.

Q.      Well, in any event, that wasn't an alternative you were willing to take. Correct?

A.      Absolutely not.

Q.      And that had already made their position clear the prior Friday that if you weren't going to go part-time –

A.      Good-bye."

Plaintiff agrees that some of her job responsibilities as Director of Nursing could have been relegated to other personnel. She also agrees that Defendant could have contracted with an RN to handle any on call requirements. She further agrees that she earned more money than the LPNs and that Defendant would save more money by eliminating her full-time position. Spesard's conversation on August 27, 2010 with Plaintiff occurred before Plaintiff called Defendant's hotline.

Plaintiff has no recollection that she raised concerns to Spesard and Lowe that she felt Smith's termination was due to Smith's age. Neither Spesard nor Folkner had any knowledge that Plaintiff opposed or complained about age discrimination on or before the decision was made to eliminate her full-time position on August 27, 2010. Neither

Spesard nor Folkner had any knowledge that Plaintiff met with Smith and instructed her to call an attorney on or before August 30, 2010. Neither Spesard nor Folkner had any knowledge that Plaintiff opposed or complained about age discrimination on or before August 30, 2010.

*Procedural Background*

Plaintiff filed her Complaint (#1) in the matter on August 8, 2012. In the complaint, Plaintiff alleges that she was informed by Spesard that the two possible candidates for termination were both "great nurses" but that Smith was "getting older." Plaintiff claims she "expressed objections over terminating Jean Smith, particularly for the reason claimed by [Spesard]" and that "[i]n response to Plaintiff's objections regarding the termination of Doris 'Jean' Smith, and the reasons for that termination, Plaintiff was herself terminated on or about August 30, 2010." Plaintiff alleges this termination was "entirely due to her engaging in protected activity under the" ADEA. Plaintiff alleges damages because "[b]y terminating the Plaintiff, Defendant and its agents have willfully and intentionally discriminated against the Plaintiff for engaging in protected activity under the [ADEA]." The parties have fully briefed the motion for summary judgment and it is ready for ruling.

ANALYSIS

Defendant makes two arguments in its Motion for Summary Judgment. First, Defendant argues Plaintiff's retaliation claim fails because she cannot establish that she engaged in protected activity under the ADEA. Second, assuming *arguendo* that Plaintiff

can establish she engaged in protected activity, Defendant argues that Plaintiff cannot show that any of Defendant's decision-makers had actual knowledge of any alleged communication before Defendant made the decision to eliminate Plaintiff's full-time decision. Plaintiff responds that: (1) Defendant's case law is either outside of the Seventh Circuit or concurring dicta; (2) because Plaintiff herself was a decision-maker and agent of Defendant, her encouragement to Smith to contact a lawyer because she believed Smith was a victim of age discrimination, combined with prior statements made by other supervisors about Smith's age, is enough circumstantial evidence for a jury to find Defendant had knowledge of Plaintiff's actions when it elected to retaliate against her; and (3) Plaintiff's phone call to the hotline on the evening of August 27, 2010 provided actual notice to Defendant of her age discrimination concerns and, because she was not actually let go until August 30, 2010, is evidence that Defendant retaliated against her.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593

F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

## CLAIMS UNDER THE ADEA

"The ADEA makes it unlawful for an employer to 'discharge any individual ... because of such individual's age.'" *Fleishman v. Continental Casualty Company*, 698 F.3d 598, 603 (7th Cir. 2012), quoting 29 U.S.C. § 631(a) (limiting the ADEA's protections to those over forty years of age). To prevail under the ADEA, a plaintiff must show by a

preponderance of the evidence that her age was the but-for cause of a defendant's decision to fire her. *Senske v. Sybase, Inc.*, 588 F.3d 501, 506 (7th Cir. 2009), citing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009). In a retaliation claim under § 623(d), such as in this case, an employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate the ADEA. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005). A party alleging retaliation under the ADEA may proceed under the direct or indirect method of proof and may rely on circumstantial evidence to meet her burden. See *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659 (7th Cir. 2013). Under the direct method, a plaintiff must prove: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Smith v. Lafayette Bank & Trust Company*, 674 F.3d 655, 657 (7th Cir. 2012).

The indirect method relies on the burden-shifting approach established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Martino v. MCI Communications, Inc.*, 574 F.3d 447, 452 (7th Cir. 2009). To establish a prima facie case of retaliation under the indirect method, a plaintiff must prove that: (1) she engaged in statutorily protected activity; (2) her performance met the company's legitimate expectations; (3) despite her satisfactory performance, she was subjected to an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in such protected activity. *Racicot*, 414 F.3d at 678. If the plaintiff satisfies these criteria, the defendant may provide a legitimate, nondiscriminatory reason for the termination.

*Martino*, 574 F.3d at 453. Assuming the defendant offers as much, the plaintiff may challenge the stated reason as a pretext for retaliation. *Martino*, 574 F.3d at 453. However, the ultimate burden to prove retaliation remains with the plaintiff. *Martino*, 574 F.3d at 453. Plaintiff has not clearly stated whether she is proceeding under the direct or indirect method. However, under either the direct or indirect method of proof, Plaintiff must prove that she engaged in statutorily protected activity. *Smith*, 674 F.3d at 658. Further, under either method, Plaintiff must show that Defendant had actual knowledge of her protected activity. *Smith*, 674 F.3d at 658.

 *Plaintiff's Claims: Her Discussion with Jean Smith and Phonecall to the Hotline*

 Plaintiff bases her retaliation claim on two incidents: (1) her private August 26 conversation with Jean Smith where she advised Smith that she was being discriminated against due to her age and to contact an attorney and (2) her phone call to Defendant's hotline on the evening of August 27, where she presumably called to complain that she suffered an adverse employment action due to her opposition to what she viewed as Defendant's discriminatory practices. As a preliminary matter, however, the court must determine when exactly the adverse employment action occurred, for it follows that, in order to satisfy the first element of the direct or indirect method's prima facie case, Plaintiff must show that Defendant had actual knowledge that she was engaging in a statutorily protected activity at the time Defendant took the adverse employment action. *Smith*, 674 F.3d at 658; See *Durkin v. City of Chicago*, 341 F.3d 606, 614 n.4 (7th Cir. 2003) (noting that an employer's knowledge of the protected activity is implicit in the first

element of the indirect method). "[P]roof of retaliation under the indirect method presupposes that the decision-maker knew that the plaintiff engaged in a statutorily protected activity, because if an employer did not know the plaintiff made any complaints, it 'cannot be trying to penalize him for making them.'" *Tomanovich v. City of Indianapolis, et al.*, 457 F.3d 656, 668-69 (7th Cir. 2006), quoting *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005).

Here, the deposition evidence clearly establishes that the adverse employment action alleged by Plaintiff occurred during her meeting with Spesard at approximately 2:00 pm on Friday, August 27, 2010. At this meeting, Spesard told Plaintiff that her full-time position was being eliminated and that she could work part-time in a nurse trainer position. Spesard also informed Plaintiff that Smith's job was not being eliminated. Although Plaintiff, in her Response, attempts to argue that she was not aware of the full impact of what Spesard and Lowe were telling her at the August 27 meeting and thus cannot be said to have suffered an adverse employment action until her official termination August 30 (the following Monday), Plaintiff's deposition testimony contradicts this argument. Plaintiff at first testifies that she believed Spesard was just telling her that her hours were cut and Plaintiff did not understand, at the time, that she would no longer have a job if she did not accept the part-time position. However, under further questioning, Plaintiff admitted that she did understand that Spesard was telling her that if she did not accept the reduced hours, Friday August 27 would be her last day. Plaintiff admitted that she understood what Spesard was saying,

but it "wasn't what [Plaintiff] wanted." The following exchange then occurred:

"Q.    I understand there's a difference between what the situation was and what

you wanted, but you understood if you didn't accept the part-time job, that

would be your last day?

A.    Right. Right."

Defendant's attorney then asked again if, at the August 27 meeting, Plaintiff

understood that if she was not going to accept the eight hours, she would no longer have

a position. Plaintiff responded "Right." Plaintiff did not remember how she responded

to Spesard at the meeting. Defendant's attorney repeatedly asked Plaintiff if she

understood at the August 27 meeting that, if she did not accept the new part time

position, August 27 would be her last day:

"Q.    Okay. Okay. You understood that if you were not accepting the new

part-time position, Friday was your last day?

A.    Yes.

Q.    Okay. Did you tell Cassidy that you weren't accepting the position that

day?

A.    No. I did not.

***

Q.    But you understood that the position that they were taking was that your

position was going to be cut, and if you didn't want to take the cut position, then

Friday would be your last day. Correct?

A.    Well, whenever was my last day. I mean...

Q.    I'm not...

A.    I don't remember.

***

Q.    My question is simply this: You were told on Friday [August 27] that the company made a decision that you don't accept the eight hours a day, then that day is your last day. Right?

A.    Right.

Q.    So you understood at that point in time that they were telling you part-time job or nothing?

A.    Right."

Plaintiff attempted to return to work the following Monday, August 30, but Spesard again informed her that, if she was not willing to take the part-time position, as discussed on August 27, she would be terminated. Plaintiff again refused the part-time position, and per the August 27 ultimatum, Plaintiff was let go. Plaintiff attempts to argue that she was not "officially" terminated until August 30, and she subjectively believed until August 30 that she still had a job with Defendant because she had "nothing in writing" that her position had been cut. Plaintiff testified that she came to work August 30 seeking a "compromise." Nevertheless, under further questioning, Plaintiff again admits that she understood back on August 27 that if she did not accept the offer of part-time employment she was "gone" and that Defendant had made its

position clear that prior Friday that if she was not willing to go part-time it was "good-bye." Thus, based on the evidence of record, Defendant had made it clear to Plaintiff on the afternoon of Friday, August 27, 2010, that if she did not accept the drastically reduced part-time hours, her employment would be terminated. Plaintiff repeatedly admits that she knew and understood, at that time, the implications of what Spesard and Lowe were telling her. Thus, for the court's purposes on summary judgment, the alleged adverse employment action occurred somewhere around 2:00 p.m. Friday August 27, 2010. Therefore, in order for her claim to survive summary judgment, Plaintiff must show that, before that August 27 meeting, Defendant was aware she had engaged in a protected activity and that Defendant's alleged adverse employment action was retaliation for her engagement in said protected activity. See *Smith*, 674 F.3d at 658 ("An employer must have actual knowledge of the employee's protected activity to state a claim for retaliation.").

First, the court will analyze Plaintiff's claim involving her August 26 conversation with Jean Smith. Assuming *arguendo* that the conversation with Smith constituted "opposition" under the opposition clause[1] of § 623(d), to state a claim for retaliation,

---

[1] The ADEA's anti-retaliation provision is the equivalent of the anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), and like its counterpart it makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices (opposition clause) or participating in any investigation or proceeding (participation clause) under the ADEA. *O'Day v. McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 763 (9th Cir. 1996). The participation clause is not at issue here, only the opposition clause. It is an open question whether the opposition clause covers "silent opposition," such as a private conversation between the adversely affected employee and a third party that is not purposely communicated from the employee to the employer. *See Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 555 U.S. 271, 283-84 (2009) (Alito, J., concurring). This court finds persuasive the concurrence of Justice Alito and subsequent out-of-circuit court opinions that would find such conduct not covered under the opposition clause. *See Thompson v. Somervell County, Texas*, 431 Fed.Appx. 338, 341 (5th Cir. July 1, 2011); *Pitrolo v. County of Buncombe*, NC, 2009 WL 1010634, * (4th Cir. Mar.

Plaintiff must still show that Defendant had knowledge of her conversation with Smith by the afternoon of August 27. *See Smith*, 674 F.3d at 658. Plaintiff cannot make such a showing. Plaintiff alleges in her Complaint, and states during her deposition and in her notes, that someone in management at Defendant must have "caught wind" of her conversation with Smith, which led to what Plaintiff alleges was her retaliatory firing/hours reduction the next day, August 27. However, Plaintiff admittedly has no evidence to support such a claim. Rather, the claim rests on mere speculation, and such speculation cannot form the basis for a genuine issue of material fact. See *Singer*, 593 F.3d at 533.

Plaintiff attempts to argue, in a convoluted manner, that because she was Smith's superior and a supervisor for Defendant, her conversation with Smith, by virtue of Plaintiff being such a supervisory employee of Defendant, somehow put Defendant "on notice" of her opposition to what she perceived as Defendant's discriminatory firing of Smith. Plaintiff's argument, posited by Plaintiff absent any citation to case law, must fail. Such "constructive notice" would eliminate any need for an employer to have any knowledge of an employee's opposition before it took the alleged retaliatory action. Therefore, because the record is devoid of any evidence that Defendant, or more specifically those employees of Defendant who took the adverse employment action against Plaintiff, had any knowledge of Plaintiff's conversation with Smith before the August 27 meeting where they informed Plaintiff of her reduced hours or termination

11, 2009); *Rice v. Spinx Company*, Inc., 2011 WL 7450630, *2 (D.S.C. Nov. 10, 2011). The Seventh Circuit has not yet addressed the issue.

option, her conversation with Smith does not satisfy the prima facie case for retaliation under § 623(d).

Next, Plaintiff argues that her phone call to the hotline on the evening of August 27 satisfies the opposition clause and shows that Defendant's reduction of her hours/termination was in retaliation for her opposition to Defendant's alleged discriminatory actions. Plaintiff claims that she called the hotline to complain about what she believed was the discriminatory firing of Smith, but, after her conversation with Spesard, she also called to complain about being forced to accept reduced or hours or face termination. Certainly, calling Defendant's official hotline to complain about discrimination, or to complain that she had been retaliated against because of her opposition to what she perceived as Defendant's discriminatory actions, would qualify as opposing discrimination under § 623(d). However, the court has already determined that the alleged adverse employment action occurred during Plaintiff's 2:00 p.m. meeting with Spesard and Lowe on Friday, August 27, 2010. Plaintiff, in her deposition, admitted that she did not call the hotline until after the 2:00 p.m. meeting:

> "Q.     Okay. Did this conversation that occurred on August 27th of 2010 at 2:00 p.m., that occurred before you contacted the hotline. Correct?
>
> A.     I don't remember. Let me look at my notes. Yes. Yes.
>
> Q.     Okay. And you knew that Jean Smith had her job back before you called the hotline?
>
> A.     Right.

Q.      And was the call that you made to the hotline subsequently the first time

you had ever called the hotline?

A.      Right.

Q.      Yes?

A.      I believe so."

Plaintiff later testified during the deposition that she made the hotline call at about 6:00

p.m. on the evening of August 27, and in response to a question asking whether she

made the call *after* Spesard had told her that her full-time position was eliminated and

she could take a part-time position, Plaintiff answered "Right." Thus, it is clear that the

phone call to the hotline occurred after the alleged adverse employment action.

Therefore, because Plaintiff cannot show that Defendant had any actual knowledge of

her hotline phone call when it took the alleged adverse employment action, the phone

call cannot serve as the basis for a claim of retaliation. See *Smith*, 674 F.3d at 658.

*Plaintiff's Refusal to Choose Either Guthrie or Smith for Termination*

Although not argued by either of the parties, indeed it was not listed as a basis for

the cause of action in Plaintiff's Complaint, the court must take note of Plaintiff's refusal

to fire either Smith or Guthrie. The U.S. Supreme Court considers it to be "opposition"

under the opposition clause "if an employee took a stand against an employer's

discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing

to follow a supervisor's order to fire a junior worker for discriminatory reasons."

*Crawford*, 555 U.S. at 277. However, the requirement still stands that the employer must

know of the employee's discrimination-related complaints, because if the employer did not know of the complaints, it cannot be trying to penalize the employee for making them. *Tomanovich*, 457 F.3d at 668-69. Further, if the opposition is made known to the employer, a general complaint will not suffice, but rather to constitute protected activity under the ADEA, the employee's complaint must include objections to discrimination based on age. *Smith*, 674 F.3d at 658.

Here, Plaintiff did oppose being asked to make a decision on whether to terminate Guthrie or Smith on August 26. However, she was not directly asked to fire the older employee. She was asked to decide between two employees, one older and covered by the ADEA, and one not. Plaintiff does claim that, during the August 26 discussion on which employee to terminate, Spesard mentioned that Smith was "getting older" and that that should be a basis for her termination. Plaintiff further claims that, during a conversation on August 18, 2010, she was questioned by Spesard about Smith's hours and Spesard commented that Smith's competition for her job was "much younger." However, importantly, when stating why she refused to choose which of her LPNs would be let go, Plaintiff never indicated to Spesard or Lowe that her opposition had anything to do with age discrimination. Rather, she told Spesard that both nurses were "awesome" and she did not think it fair to be asked to choose which one to terminate. Plaintiff admits she gave "push back" to Spesard, but the "push back" apparently did not include any specific reference to age discrimination. In fact, during her deposition, when asked if she ever raised her concerns to Spesard and Lowe that she

felt Smith's termination was due to Smith's age, Plaintiff stated that she could not remember and "could not say" that she did so.

Further, the court could not find, and Plaintiff did not point to, any portion of Plaintiff's notes where she states she informed Lowe and Spesard, before the August 27 alleged adverse employment action, that the reason she was refusing to recommend Smith or Guthrie be fired was because of Smith's age. Thus, there is no evidence that Plaintiff ever communicated to Defendant, before the August 27 2:00 p.m. meeting, that her refusal to recommend Guthrie or Smith for termination was due to her belief that Smith was a victim of age discrimination. Therefore, because Plaintiff cannot show that Defendant had any actual knowledge that her refusal to choose Smith or Guthrie was based on Plaintiff's opposition to perceived age discrimination before it took the alleged adverse employment action, Plaintiff's refusal cannot serve as the basis for a claim of retaliation. See *Smith*, 674 F.3d at 658.

## CONCLUSION

Plaintiff made two main claims as bases for a prima facie case of retaliation against her by Defendant. Plaintiff claimed that she was forced to accept reduced hours or termination in retaliation for her advising Jean Smith to seek legal counsel for unlawful age-related discrimination and for Plaintiff's phone call to Defendant's hotline to complain of discrimination and retaliation. There is no evidence in the record, beyond Plaintiff's mere speculation, that anyone at Defendant was aware of her conversation with Smith at the time of the adverse employment action.

The record is also clear that Plaintiff's phone call to the hotline occurred after she suffered the adverse employment action. Further, the evidence of record demonstrates that, despite her refusal to recommend the firing of Smith or Guthrie, Plaintiff never communicated to Defendant that her refusal to choose was informed by her opposition to perceived impermissible age-related discrimination. Accordingly, Plaintiff is unable to show that the employees of Defendant who terminated her were aware that she ever opposed Smith's termination on age-related grounds. *See Smith*, 674 F.3d at 658. "'This dooms [Plaintiff's] claim not only under the direct method, but also under the indirect method.'" *Smith*, 674 F.3d at 658, quoting *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009). Thus, for the foregoing reasons, Defendant's Motion for Summary Judgment (#43) is GRANTED.

## ATTORNEY'S FEES

On January 17, 2014, Magistrate Judge David G. Bernthal entered a Report and Recommendation (#42) in this case recommending that Plaintiff be sanctioned for failure to comply with the discovery process and ordering Plaintiff to pay costs and attorney fees reasonably incurred by Defendant in connection with Defendant's efforts to obtain proper responses to its discovery requests. Plaintiff did not object to Judge Bernthal's Report and Recommendation. This court entered an Order (#44) accepting Judge Bernthal's Report and Recommendation in total on February 13, 2014.

On February 26, 2014, Defendant's attorney filed an Affidavit of Costs and Fees (#46). In the affidavit, Defense counsel stated she charged $220 per hour and this rate

represents a reasonable hourly rate charged by employment law attorneys in the Urbana, Illinois area. She noted that Plaintiff's counsel has submitted billing invoices reflecting that he charges $200 an hour. Plaintiff further averred that she spent 12.5 hours in connection with efforts to obtain discovery compliance from Plaintiff. Plaintiff has filed no objection or response to Defendant's attorney's affidavit. Upon a review of the affidavit and accompanying documentation, the court finds Defendant's requested fees to be reasonable. At $220 per hour, with 12.5 hours of work, the total costs and fees comes to $2,750.00. Plaintiff is ordered to pay that amount in costs and fees to Defendant.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#43) is GRANTED in full. Judgment is entered for Defendant and against Plaintiff.

(2) Plaintiff is ordered to pay $2,750.00 in costs and fees to Defendant.

(3) This case is terminated.


ENTERED this 30th day of June, 2014.



s/ COLIN S. BRUCE
UNITED STATES DISTRICT JUDGE